Wiley, Trustee, *v.* Brundred et al., Appellants.

[Marked to be reported.]

*Partnership—Accounts—Assignment—Fraud—Concealment—Equity.*

On a bill for an account against a partner by his copartners, it appeared that plaintiffs had assigned to defendant all of their interest in the book accounts, claims and assets of the firm for a money consideration.   Plaintiffs contended that defendant had knowledge of a claim against a railroad company for discrimination, and that he had concealed the facts relating to this claim at the time the assignment was made.   Defendant did not deny that he had collected the claim from the railroad company, but averred that all of the parties knew of the existence of the claim, that they had frequently discussed it, and that defendant desired to bring suit upon it, but was opposed by plaintiffs.   Plaintiffs did not deny that they had discussed the claim prior to the assignment.   Evidence for defendant tended to show that after the assignment was made he obtained from an official of the railroad company evidence by which he collected the claim. *Held,* that the bill should be dismissed.

Argued Oct. 5, 1893.   Appeals, Nos. 141 and 259, Oct. T., 1893, by defendant, B. F. Brundred, and by plaintiff, John A. Wiley, trustee, from decree of C. P. Venango Co., April T., 1889, No. 4, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill in equity for account.

The bill was originally filed by John A. Wiley against B. F. Brundred, M. Hulings, Wesley Chambers and the Union Re-

fining Co., Ltd., but it was amended to read Marcus Hulings, trustee, for himself and John A. Wiley and Wesley Chambers, against Union Refining Co., Ltd., and B. F. Brundred.

The case was referred to Thomas McGough, Esq., as master, from whose report it appeared that M. Hulings, John A. Wiley, Wesley Chambers and B. F. Brundred, on April 8, 1880, formed a limited partnership under the name of the Union Refining Company, Limited, of which the defendant Brundred was general manager. On Oct. 11, 1882, the company assigned to M. Hulings, trustee, all claims and debts due and payable to the company, to collect the claims, pay the debts of the company, and distribute the residue to the persons entitled to it. On April 6, 1883, Hulings, Chambers, Wiley and Brundred met and discussed the question of selling the claims of the company to one of their number. A statement of the claims and liabilities was submitted by Brundred. In consideration of a money payment, and the assumption of debts due by the firm, all of the claims were then assigned to Brundred. After the assignment Brundred collected from the Pennsylvania Railroad $8,000 on a claim for overcharges. This claim was not in the statement made at the time of the assignment. Plaintiffs claimed that defendants had fraudulently concealed the facts of this claim from them, and prayed for an account. The testimony relating to the controversy is fully stated in the opinion of the Supreme Court.

The master found that the claim against the railroad was not in the minds of the parties at the time of the assignment, and that it did not consequently pass with the other assets to Brundred. He accordingly recommended a decree in favor of plaintiffs. He however allowed $3,408.20 for expenses incurred in making the collection. Exceptions to the master's report by both plaintiff and defendant were dismissed by the court.

*Errors assigned* by defendant were dismissal of his exceptions to the master's report, quoting them.

*Errors assigned* by plaintiff were dismissal of his exceptions as to the allowance to defendant of expenses in collecting the claim against the railroad company, quoting the exceptions.

*C. Heydrick* and *Isaac Ash, P. M. Speer, J. H. & A. R. Osmer,* and *Carl I. Heydrick* with them, for appellant.—Where the evidence is conflicting and the credibility of witnesses is involved, a master's finding upon a question of fact is entitled to the same consideration as the verdict of a jury, and will not be set aside unless it is clearly and palpably against the weight of the testimony. If, however, his finding is a deduction from undisputed facts, or from uncontradicted and credible evidence, the controlling reason for the application of this principle is not present, because in such case he has no greater facilities for reaching a correct conclusion than the court has in passing upon the exceptions to his report: McConomy v. Reed, 152 Pa. 42.

The issue in this case was whether the parties possessed equal knowledge of the subject-matter of their contract, and, if not, whether Brundred fraudulently concealed facts which it was his duty to communicate to the other parties. The evidence was amply sufficient to show that there was no concealment.

Plaintiffs were guilty of laches in asserting their claim: Neely's Ap., 85 Pa. 387; Penna. R. R. Co.'s Ap., 125 Pa. 189.

*Geo. S. Criswell* and *Roger Sherman, J. W. Lee* with them, for appellees.—The courts have uniformly applied the law of partnership to limited partnership associations, and have maintained the equitable jurisdiction in dealing with them: Act of June 2, 1874, P. L. 271, § 1; Appeal of Hite Nat. Gas Co., Ltd., 118 Pa. 436; Coffin's Ap., 106 Pa. 280; Hileborn v. Pub. Co., Ltd., 12 W. N. C. 548.

When a person stands in a fiduciary relation to others, as agent or partner, or otherwise, and by some trick, artifice or falsehood has attained an unfair advantage over those to whom he stands in such relation, and has, through such fraud, got from them property, a bill in equity can be maintained to right the wrong and recover the property or its value: Story's Eq. Jur. § 68; Bierbower's Ap., 107 Pa. 14; Brush Electric Light Co.'s Ap., 114 Pa. 585; Earley's Ap., 121 Pa. 511; Pittsburgh & Connellsville R. R. Co., 99 Pa. 177; Gloninger v. Hazard, 42 Pa. 389.

There was no laches: Evan's Ap., 81 Pa. 278.

WILEY, TRUSTEE, v. BRUNDRED ET AL., APPELLANTS.

OPINION BY MR. JUSTICE GREEN, December 30, 1893 :

There is but a single question involved in the present contention, and that is whether the defendant is liable to account to the plaintiffs for the sum of $8,000 received from the Pennsylvania Railroad Company. The right of recovery is based upon the proposition that the defendant was guilty of a breach of the good faith which is required between partners. If this charge is true the plaintiffs have a right to recover. If it is not true they have no case. The effect of the assignment to the defendant, through the Union Refining Company, Limited, by all the individual members of the company, of " all claims, rights of action and demands due to said " company by the paper executed on April 6, 1883, is not questioned. The defendant succeeded to every right and claim which was owned or possessed by the company at that time, and that contract was fully carried out by the parties on both sides, and it is not now in controversy. But it is claimed by the plaintiffs, and denied by the defendant, that the facts then existed which gave the plaintiffs the right to have an account, and a distribution of the money which the defendant subsequently obtained from the Pennsylvania Railroad Company.

If at the date of the assignment the defendant had a knowledge of a legal right to recover that money, which was superior to the knowledge possessed by the plaintiffs, and concealed that knowledge from his partners, and thereby obtained the assignment of all the claims, rights of action and demands of the firm to himself, he is responsible to the plaintiffs in this proceeding, unless the statute of limitations or the laches of the plaintiffs bars their action. The bill charges that the defendant had such knowledge of the claim against the railroad company, and that he concealed it from his partners, while the answer denies the charge in the most direct, emphatic and positive manner, and sets up a counter assertion that he had no other knowledge of the claim than his partners had, and that he concealed nothing from them in this respect, either before, or at the time of the transfer. The answer also alleges that the subject of a claim against the railroad company for excessive freight charges was frequently a matter of conversation among all the members of the firm, and that he, the defendant, was in favor of a legal pro-

ceeding to recover the claim, but that the other partners were either opposed to any proceeding or indifferent to it. The answer further alleges that the defendant did not discover any evidence which could be used against the railroad company until after the assignment was made. These matters of fact therefore are of the very essence of the controversy, upon which its decision depends. On the hearing before the master considerable testimony was taken upon these subjects. All the partners were examined and the bookkeeper of the firm. On the question whether the defendant at the time of the assignment had any knowledge of the claim against the Pennsylvania Railroad Company, superior to the knowledge possessed by the other partners, the master makes no finding. Nor does he find that the defendant concealed any personal knowledge of his own from them. He finds that nothing was said about it, and that it was not mentioned in the trial balance that was then before the parties. But if nothing was said about the matter, and if nothing was concealed, and if the defendant had no knowledge of the claim, that was superior to that of his partners, it is difficult to understand upon what ground the plaintiffs' claim can be sustained. The circumstance that it did not appear on the trial balance as an asset of the firm is of no sort of consequence, as there was no reason why it should be there. It was not an ascertained, definite claim, as for goods sold, or for anything due. It was at the best an undefined, uncertain, unproved, unliquidated right of action which might or might not be sustained, and about which none of the parties had any explicit knowledge or anything more than a belief. What was its amount, if it had any amount, was totally unknown to all. Of course it could not be made out as a cause of action before a court and jury, unless testimony could be obtained of witnesses having knowledge of specific facts to which they could testify. The master does not find, and there is not a scrap of testimony on this record to prove, that at that time, April 6, 1883, or before, any one of these parties had the slightest knowledge of even the existence of any witnesses who could give any testimony on this subject, nor of any definite acts to which any such witness could testify. It was impossible therefore to put down amongst a list of assets any such claim or demand as this. Even as a right of action it would require the assent of all the parties entitled to it to give

it any tangible character.   For if, knowing that it was the sub
ject of a demand which might be made, yet the parties entitled
to assert it refused or were unwilling to assert it, for any reason,
such as the expense, or the uncertainty, or delay of legal pro-
ceedings, it would be the same as if it had no existence.   Nor is
it anything to the purpose to know by the subsequent event
that such a claim had value, or had been so managed that value
was infused into it.

The question is, what was the situation of the parties relative
to the subject at the time of the transaction.   It is to be re-
gretted that there has been no finding of the master respecting
these most essential matters.   The testimony of witnesses was
quite considerable with reference to them, and yet that testimony
has not been discussed, nor even referred to, in the master's
report.

All of the plaintiffs were examined in their own behalf, and
yet not one of them proved, or attempted to prove, that the
defendant had superior knowledge to them of the existence of
the claim, or that he concealed anything from them.   They all
admitted, with some reluctance, and on cross-examination, that
the subject of discriminations and excessive freight charges by
the railroads was a matter of conversation and discussion be-
tween them.

Thus General Wiley testified: "We all discussed matters
generally and had a voice in the management. . . . We all
discussed the business of the company.   I was the secretary
and treasurer of the company.   I participated in the meetings
of the board.   I think we were all officers of the company. . . .
I had access to the books at all times and to the correspondence
and other papers so far as they were in the proper books. . . .
We met occasionally; came together informally, not daily, quite
frequently. . . . The bookkeeper was there and the books.
I think that the bank book was kept at the Hulings office, the
check and bank book, part of the time at least, and that was
the place we had the meetings.   Q. Was it not a matter of
frequent discussion between the members of your company,
including yourself and Mr. Brundred, that the railroad com-
panies that carried your product to market, or some of them,
including the Pennsylvania Railroad Company, were discrimi-
nating against you and in favor of the Standard Oil Company

in respect to charges for transportation? A. It is possible there might have been such discussion, but I don't remember an instance wherein we concluded we were discriminated against. The freights to New York were considered reasonable. Q. Did not you believe, and did not the other members of your company express their belief, that your company had been discriminated against by the Pennsylvania Railroad Company, and other railroad companies, in the matter of transportation? A. I don't know that we made up our minds in any sense at all that we were discriminated against. I did not believe it, I don't know what the others believed about it."

After saying that it had been commonly said that the railroad companies discriminated against the company and in favor of the Standard Oil Company, and that he did not remember discussions among the members of the company of claims for discrimination, he was asked: "Q. And did not Mr. Chambers on at least one occasion express himself adversely to a resort to litigation on account of said claims, assigning as one among other reasons that the amounts which you would be entitled to recover, if any, would not be large enough to justify the expense and risk of failure? A. I don't remember any such proposition as that; it might have been talked of; I don't recollect it."

Mr. Hulings, another of the plaintiffs, who took an assignment of all claims and debts due and payable to the company up to Oct. 1, 1882, to be used in paying all debts and liabilities of the company, and who administered his trust to April 6, 1883, when the final assignment was made, was examined for the plaintiffs and gave testimony. He was asked: "Q. While your company was shipping oil, state if it was not their belief that other companies were getting better rates in freight than you were? A. I think there was some talk of that kind, but I have no definite recollection in regard to it. Q. State if Mr. Brundred didn't state that he believed that there were rebates or better rates given to other parties who shipped refined oil west? A. I believe there was conversation of that kind. But I can't recall anything definite. Q. Did he not also make the same allegation of refined oil shipped east? A. I can give you nothing more definite than to say there was some conversation of that kind, but I recollect nothing definite. Can't recall how often he spoke about it."

Mr. James B. Berry, the bookkeeper of the company, who was present at the meeting of April 6, 1883, said: " There had been a conversation from time to time that there was a claim against the Pennsylvania Railroad Company, but there was no definite knowledge. I had frequently heard the officers of the Union Refining Company, Limited, talking of discrimination in freights; it was a matter of newspaper news, but nothing definite. I had no information that would justify in putting the claim on the books of the company as a definite charge. . . . Q. Didn't you know that Wiley, Chambers, Hulings and Brundred all claimed, at and a long time before the settlement, that the Pennsylvania Railroad Company had been discriminating against them in the transportation of their products? A. Only in the way of conversation; suspicion that such was the case; nothing to base any charge on. Q. Then they had expressed their belief that they had been discriminated against in their conversation? A. Yes, I suppose in general conversation."

Mr. Chambers, another of the plaintiffs, was examined for the plaintiffs. He was asked: " Q. Was it not a subject of conversation among the members of the company, prior to the time you sold out, that the Pennsylvania Railroad Company and other railroad companies were discriminating against you and in favor of the Standard Oil Co. in the transportation of your product? A. I don't remember what was said among the members of the company about the discrimination of freights, for the reason that I had so many public discussions of the subject in general with different persons and in the Producers Association previous to that time. It would be hard to separate my conversations, if I had any, with the company, from the general discussions outside. The general discussion had been very common. Q. Do you remember that some time in 1882 Mr. Brundred proposed bringing suit against the Pennsylvania Railroad Company and that you opposed such suit, for the reason that it would be expensive and your company would not be able to cope with the railroad company? A. I don't remember it, but I had a general idea that our claims would be too vague and indefinite to base a suit on. I don't remember any conversation about it. I thought we knew too little about it."

The foregoing is practically the whole of the testimony of

the plaintiffs in relation to the subject of this claim. There was other testimony but it related to other matters and is not pertinent to the present inquiry. Bearing in mind now that the essential facts necessary to be established by the plaintiffs are, that the defendant had a knowledge in reference to the claim, or a claim, against the Pennsylvania Railroad Company, which was superior to the knowledge possessed by the plaintiffs, and that he concealed that knowledge from them, and that without establishing these facts the plaintiffs have no right of recovery in this proceeding, it is proper to inquire, does this testimony establish or tend to establish either of these propositions? To this inquiry there can be but one answer. There is nothing in the testimony of all, or any, of the plaintiffs that establishes, or tends to establish, either assertion. No facts are given in evidence which disclose any superior knowledge of the defendant, or that he concealed from his partners any fact that he knew relative to the subject. Mr. Wiley, admitting that there were discussions among the partners upon the subject which he could not particularize, said distinctly that he did not believe that they were discriminated against, and Mr. Chambers, making a similar admission, said he thought their claims were too vague and indefinite to base a suit on. It is very evident from the testimony of all the plaintiffs that the subject of the discriminations of the railroad company against them was a matter of conversation among the members of the firm, and it is also evident that none of the parties, plaintiffs or defandant, had any specific knowledge of facts upon which a charge of discriminating rates against the railroad company could be made out. They do not pretend to prove any such knowledge on the part of the defendant, and they admit they had none. The master makes no finding on this subject and he does not review the testimony or discuss the question. If the defendant had entirely omitted to testify, it is difficult to understand how there could be any recovery against him on the testimony furnished by the plaintiffs. But he did testify, and the following are some of the matters he gave in evidence.

He was distinctly interrogated as to whether he had any knowledge of any facts, or evidence, to establish the claim before the transfer of April 6, 1883, was made, and he said he had not. He was asked : " Q. State whether at the time of the

transfer of your refinery, you were in possession of any facts or
evidence of any claim existing in favor of your company against
the Pennsylvania Railroad Company, for or on account of over-
charges for freight, or discrimination against your company?
A. I was not, and I did not know where we could secure any
evidence of such. Q. State whether or not you knew, or had any
evidence, of any discrimination by said railroad company against
your company in fact, or in other words had you any evidence
that your company had been discriminated against, as a matter
of fact? A. I had none whatever. Q. On the 6th of April,
1883, when the paper marked Exhibit 'B' was executed and
delivered to you, had you or had you not any evidence of a
claim existing against the Pennsylvania Railroad Company as
an ascertained fact, and did you then know that such evidence
existed anywhere? If so, state all you then knew on the sub-
ject. A. I did not. I did not have any evidence and did not
know where evidence could be obtained necessary to substan-
tiate a claim."

The foregoing is a specific and flat denial of the possession
of any knowledge on the subject, either of the fact, or of any
evidence to prove the fact, of adverse discrimination, up to and
including the time of the transfer of April 6, 1883. The plain-
tiffs were afterwards recalled and again examined in their own
behalf, but they made no contradiction of the above testimony,
they made no attempt to prove that the defendant had such
knowledge, or knew of any testimony which he could get to
support the claim, and their failure to submit such proof is
practically conclusive that they were not able to do so. It was
proved by the defendant and the bookkeeper, Berry, and ad-
mitted by the plaintiffs, that they had perfectly free access at
all times to the books and papers of the partnership, and that
they exercised an active intervention in the business. They
must have known precisely what rates were charged, and there-
fore had the same knowledge on that subject that the defend-
ant had. The defendant testified: " The bank book, check
book, draft book, minute book and stock book were kept at the
city office. We kept letter books; letters written by and in
behalf of the company were all copied; press copied. These
letter books and correspondence of the company were kept at
the office at the works. These books were accessible to the

members of the partnership.   We had a telephone in each office, and we made about daily reports backwards and forwards by telephone or by written reports.   The members of the company met frequently and had general discussions about the company's business.   Mr. Wiley was frequently up at the works.   And Mr. Chambers was very frequently up at the works, and would go over the business with us generally, and would often come. to my house in the evenings and Sunday afternoons and go over the same stuff then that he had been over several times during the week.   These conversations with Mr. Chambers were discussions as to the business of the company; such as the profits, sales, stocks, freights, insurance and other details. . . . He was looking after some of these things with me about the whole time. . . . The matter of freight rates was very frequently discussed between myself and the other members of the firm, especially with Mr. Wiley and Mr. Chambers.   We had different discussions as to rates.   Some of them we regarded as excessive, and some of them we regarded as discriminations.   There were competitive refiners who were constantly underselling us, and the advantage they possessed which enabled them to do so apparently rested entirely on more favorable rates of freight than we possessed, and these points would be called to the attention of Mr. Wiley and Mr. Chambers about as often as they would occur, which was very frequently. Freight rates was very frequently the subject of correspondence on behalf of the company.   Mr. Wiley and Mr. Chambers had access to the company's letter books at all times.   Mr. Wiley participated in that correspondence on behalf of the company. . . . I had a conversation with Mr. Chambers and Mr. Wiley with reference to the freight charges of the Pennsylvania Central.   We had discussions right along, but the first I recall now was in the fore part of 1881.   I always claimed that our competitors were getting better rates than we were. I called their attention to the fact that we were evidently being discriminated against because Pittsburgh and other parties were continually able to undersell us, and I thought it must be entirely attributable to better rates.   I know I said these things to Mr. Chambers because he gave the business a great deal of attention.   There was hardly a week passed that he was not at this ' rate ' business in some shape, and annoyed me so about

the thing that I got out of all patience sometimes with him. I didn't see as much of Mr. Wiley as Mr. Chambers, but I frequently spoke to him about these things and the chats with Mr. Chambers. The discussions of the subject continued till we sold out. I spoke of this 25 cent advance as one of the instances. I had another talk with Mr. Chambers, complaining of these discriminations, that we couldn't meet the Chicago markets, because the Tide Water Refining was getting their oil into Chicago from Philadelphia on only a 65 cent per barrel rate. This matter was the subject of correspondence by the company." Certain letters were then given in evidence. The witness proceeding said: "I had talked to General Wiley and Mr. Chambers in regard to supposed discriminations of Pennsylvania Railroad Company, and talked of bringing suit against the railroad company. In June, 1882, I consulted Mr. Ash on behalf of the company in regard to the suit, and he said, after asking what evidence we had, he thought it was doubtful if we could collect anything without definite information; that he would like to bring a suit for us at any time. I explained this to my partners, and told them I thought if we could get these people on the stand we could worm something out of them. General Wiley seemed indifferent about it; Mr. Chambers opposed it; said it would be nothing but a wild goose chase, we did not know enough about it and he did not want to go into it. At the time of the talk with Mr. Ash we had only the suspicion that they were discriminating against us. I had no information as to discrimination that was not common to my partners. The date of my consultation with Mr. Ash was June 6, 1882. It is in my diary made at the time."

Notwithstanding that General Wiley and Mr. Chambers were subsequently examined on their own behalf, neither of them uttered a word of denial of this most important testimony, absolutely fatal to their case if true. As a matter of course it must be taken as verity. There is not a reason why it should not be. The master pays no attention to it in his report, does not discuss it or any question growing out of it. General Wiley and Mr. Chambers had previously admitted, the one, that he did not believe that they were overcharged, and the other, that they did not have enough facts " to base a suit on." So that they really corroborate the defendant in his testimony.

The legitimate effect of the testimony is to prove conclusively, (1), that the defendant had no other knowledge of any claim against the railroad company than was possessed by the plaintiffs, and (2), that, instead of the defendant concealing such information and belief as he possessed from his partners, he was most persistent and even pertinacious in his efforts to give them every information he had, and his convictions as to what they might be able to do by bringing a suit against the railroad company.   He advised with counsel for the purpose of bringing a suit and informed his partners as to what he had done, and of the reply of the counsel.   Notwithstanding that reply was unfavorable to an immediate proceeding because they had not enough facts, the defendant still urged a suit upon his partners, saying if they could "get these people on the stand they could worm something out of them."   But General Wiley was indifferent and Mr. Chambers opposed it, "said it would be nothing but a wild goose chase, we did not know enough about it and he did not want to go into it."   How is it possible that these plaintiffs after such damaging, indeed fatal, testimony as this, which they do not pretend to deny, can come into a court of equity and claim that they were kept in ignorance of their rights by the defendant, when he was the only member of the firm who took any interest in the assertion of the right, informed them most fully of all he knew about it and all he believed, and urged them to commence a lawsuit for the recovery of the very claim which he subsequently prosecuted with success, and they positively refused to engage in?   They were a majority of the firm.   Without their consent he could not bring any suit or take any active steps to recover the excessive freights.   Of course they were not ignorant of the supposed claim, and of course the defendant concealed nothing from them.   There is no other conclusion than this that can be drawn from this testimony.   We have no right nor any disposition to disregard it.   The master overlooked it, not intentionally, but because he mistook the true character of the contention and adjudged the case by the application of principles and reasoning that do not control the controversy.   There is no dispute about the law and the good faith required of partners. The plaintiffs had sold out with evident satisfaction all their interests in the partnership, and had received from the defendant

the full consideration of the transfer of their rights.   There is
no attempt here to set aside that transfer.   The plaintiffs en-
joyed the full benefit of it.   They have in their hands the
money which the defendant paid them for it, and they do not
propose to return it.   In addition to that the defendant testi-
fied that he had paid, after the transfer, several hundred dollars
worth of debts of which they were all ignorant at the time of
the transfer.   The plaintiffs have also been relieved from lia-
bilities which they dreaded and which they were glad to get
rid of.   They do not ask, therefore, to set aside the transfer.
They ask only an accounting for the money received by the
defendant from the railroad company six months after the trans-
fer.   They are entitled to have it if they can prove two things,
to wit, that the defendant had superior knowledge to theirs of
the supposed claim against the railroad company, and that he
concealed that knowledge from them.   They have utterly failed
to prove either of these facts.   On the contrary the testimony
is simply overwhelming that they knew all that he knew about
it, and that instead of his concealing anything from them upon
this subject, he was constantly informing them of his views in
regard to it, constantly discussing the matter with them, and
earnestly endeavoring to induce them to engage in efforts to
learn the actual facts, and to recover the excessive charges by
adverse proceedings in the courts.   But they would have none
of it.

There was far more testimony in support of the defendant's
contention than his own and the plaintiffs' admissions.   Thus
Louis Morris, who was an inspector of oil trains during the
time of the partnership, testified that his business required him
to be frequently at the works of the company, that he knew
Wiley and Chambers, that " they came up to the works nearly
every day. . . . I saw Mr. Chambers very often there and also
Mr. Wiley.   They overlooked the business, the books and
yard.   They overlooked the works, but mainly in the office.
I heard Mr. Brundred, Mr. Chambers and Mr. Wiley speaking
of discrimination and charges of railway companies.   They
were complaining of overcharges of the railways.   Q. State
whether or not they referred to any road as discriminating
against them, and, if so, what company?   A. The Pennsylvania
Railroad mainly.   I heard these conversations pretty often, but

I cannot say how many times. Q. In these conversations which you refer to, state what they did say about railroads discriminating against them? A. They said the railroads had raised them 25 cents a barrel, and they thought the other roads were discriminating against them also. Q. Did they express an opinion as to their belief whether other refineries were getting better rates than they had to pay, and if so what was that opinion? A. It was simply this way. They expressed their belief that other parties had better rates, and gave as a reason that other refineries could undersell them, especially Pittsburgh. These conversations were principally after the time the rate was raised 25 cents per barrel. They were in 1881. Q. How long did these conversations continue from the time you first heard them. A. They continued until they sold out the Union Refinery. Mr. Chambers did most of the talking in these conversations as near as I know, am not positive. The three participated in the conversations. These conversations referred mainly to the Pennsylvania Railroad. Q. They related also to other roads shipping oil from their refinery, did they not? A. They related to nearly all the roads, I suppose, mainly to the Pennsylvania Railroad, that was the general talk. The matter of freights is a very important matter in refining and selling oil."

Thus it appears from the testimony of this witness, who was entirely disinterested, that the subject of discriminating and excessive rates was a constant matter of discussion and complaint between the plaintiffs and defendant, and continued to be so until the time they sold out their refinery, which was in 1882, shortly before Hulings was appointed trustee to collect the debts and pay the liabilities. As the claim was one which rested entirely on suspicion and belief, and had no definite aspect, the partners were all upon the same footing in regard to it. And it was a live and pressing subject all the way to the last. There was no lack of community of knowledge and information among the partners. But the defendant believed in it as a thing that might be realized by proper exertion and action, and so urged upon his partners, but the plaintiffs had no faith in it and refused to take any action. The same witness gave further testimony of a similar kind. Amongst other things he said: "There was a general talk right along about discrimination by

Wiley, Brundred and Chambers. I did not take part in the conversation. I was working for the Green Line. About all I heard was about discrimination in freights and rebates in refined oil and its products. Mr. Brundred threatened to sue the railroad company."

E. L. Ancker, another witness who was one of the bookkeepers for this company, said that "Mr. Chambers and Mr. Wiley were there frequently, but Mr. Chambers more frequently than Mr. Wiley, Mr. Hulings occasionally. Wiley and Chambers, when there, came as members of the firm, and talked over the business matters. . . . The books were always open to any member of the firm. Mr. Chambers looked over the books quite frequently and Mr. Wiley whenever he came down there, which was not so often as Mr. Chambers. . . . Have seen them look over them all, the ledger, cash book and order book. In these conversations they would discuss the shipment of goods and discriminations in freights. In discussions of discriminations of railroads in freights Mr. Brundred was present. I never heard any discussion on this subject when Mr. Brundred was not there. I believe a month or two before they sold out these discussions were quite frequent, more so than before. In this matter the Pennsylvania Railroad was most mentioned. On this road we made about three fourths of our shipments. They said they thought they were being discriminated against, but didn't know they were. They all held to this opinion."

F. J. Baker, who was a tally man in the employment of this company, was asked: "Q. State whether or not in 1881 and 1882 you heard discussions and talk in the office about railroad companies discriminating against the Union Refining Company in freights, giving others better rates? A. I have, I have heard Mr. Brundred, Mr. Chambers and Mr. Wiley talking about it. The conversation was that they thought they were discriminated against, by the railroads, but just how it was they could not tell. . . . The conversations were frequent, it was part of the business."

The witness, J. B. Berry, testified to a similar effect.

In the face of all this testimony, none of which is discussed, or even referred to, by either the master or learned court below, it is useless to say that there was not a community of knowledge by all the partners upon this subject, or that there

was any concealment by the defendant from his partners of any knowledge, information or belief possessed by him.   The simple truth of the whole matter is that none of them had any absolute or definite knowledge upon the subject.   The defendant had a stronger conviction than the others that something could be done by proper exertion, and this he imparted fully, and frequently, to his partners, but could not induce them to act.   It was all in vain, they would do nothing; but it is not true in the smallest degree that they were misled, or defrauded, by any act, word or omission of the defendant, into parting with their entire interest in the concern.   After the transfer of April 6, 1883, the plaintiffs gave themselves no concern whatever about any claim which they had, or supposed they had, or might have, against the railroad company, for excessive freight charges. They took no steps of any kind to discover evidence which would establish such a claim, or to institute any kind of proceedings to recover any money on account of it.   It was not so with the defendant.   The moment he was free to act for himself, and was untrammeled by the opposition of his partners, he set to work to discover evidence upon which a claim could be founded.   He knew a young man in the freight office of the railroad company, and he went direct to him, and pressed him with inquiries until he began to obtain some information.   He says, speaking of the young man : " He told me there were 13 cents paid to some parties on eastern shipment, and 10 cents, he thought, on western shipments of oil, but just what it was on, the particular kind, or the length of time, he did not know." This was enough for the defendant to act upon, though it was not definite as to his own company.   He immediately went home and had a statement made up of claims for all shipments eastward, at the rate of 13 cents a barrel, and on all western shipments at 10 cents a barrel.   These statements he sent to the railroad company, who at once rejected them and refused to pay them.   Then, during May and June, 1883, he went to Philadelphia and tried to get the railroad company to reconsider their decision, but they again refused.   On August 28th, he went there again and made another effort, and was again refused.   Then he says, " I made up my mind there was no chance to get anything out of them and was just leaving as Mr. Wilson, the general freight agent of the Pennsylvania Railroad

Company, made a remark reflecting on the ability of his predecessor, that he couldn't be expected to make good the errors and bulls of his predecessor. His predecessor was J. McC. Creighton; I thought this was a good time to interview Mr. Creighton, went to his house, he wasn't at home; saw him down town in Philadelphia, and explained this remark of Mr. Wilson to him. It provoked him to such an extent he asked me if I could go back with him and see Wilson. We accordingly went back there; found Mr. Wilson had gone over to New York in the mean time; then went up to Mr. Green's office and went in. He asked to see Mr. Green, who sent out word he was busy. Mr. Green was vice president of the Pennsylvania Railroad Company. He then told the messenger boy to tell Green that Jim Creighton wanted to see him and pretty damned quick. We were then admitted to Mr. Green's office. Creighton told him of Wilson's remark, and added that as that was the third or fourth time he had heard derogatory remarks of that kind made by the Pennsylvania Railroad Company's officials, that he had made up his mind that it had got to stop. He said that I had explained to him the nature of the claim I had made on them, and, if I was obliged to sue it, he would testify in regard to it, and show them whether he had made those bulls and errors they had alleged. . . . I came home. After that the claim was sent in again. There was a request from the company to send in the claim again. That is my letter." Then follows the correspondence between the defendant and the company, and some more oral testimony as to further efforts made by the defendant, which resulted in an adjustment of the claim at $8,000, and payment of the money in the latter part of October, 1883, more than six months after the plaintiffs had sold out to the defendant.

It is a matter of surprise to us that the foregoing testimony made no impression upon the master or the court below. It proves most conclusively that this so-called " claim " had no existence as a " claim " at any time prior to the sale by the plaintiffs to the defendant of all their interests in the partnership. It was brought into existence on August 28, 1883, by a merely casual remark of one who was an entire stranger to this firm. But that remark was merely a suggestion, and an incentive, that excited the ingenuity and the astuteness of the defendant, prompting him as

to how he could best make use of it to obtain the information he so much needed. He happened to strike the right chord, and by his appreciation of the motives which govern many persons, accomplished success by his own unaided efforts. He had not the slightest assistance from any of his former partners. If he had not succeeded, they, of course, would have had no claim upon him, as for not collecting a visible asset, for neither they nor he, when they sold him all their interest in the firm, had the slightest available knowledge on the subject.

This testimony also disproves most conclusively all idea of a reservation or withholding of knowledge by the defendant, from his partners, of facts necessary or available to establish the claim in a legal sense, because he never obtained that knowledge until months after the transfer. These considerations dispose of this case. The matters discussed in the master's report and the opinion of the court below are foreign to the points upon which alone the case must be decided. Upon a most careful examination of the whole of the testimony we are clearly of opinion that there is no proof of any breach of partnership duty on the part of the defendant, and he is entitled to enjoy the fruits of his own exertions, and his own skill and ingenuity in obtaining the evidence upon which to build up the claim, and in his subsequent efforts to enforce it.

The decree of the court below is reversed, and the plaintiffs' bill is dismissed at the cost of the plaintiffs.

WILEY, TRUSTEE, APPELLANT, v. BRUNDRED ET AL.

OPINION BY MR. JUSTICE GREEN, October 30, 1893:

For the reasons stated in the opinion in this case on the appeal of B. F. Brundred, the decree of the court below is reversed and the plaintiffs' bill is dismissed at the cost of the plaintiffs.